UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CRG FINANCIAL, LLC and CLAIMS RECOVERY GROUP, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>TWO DIAMOND CAPITAL CORP. and MEDEA, INC.<br><br>Defendants | Civil Action No. _____ |

**VERIFIED COMPLAINT AND JURY DEMAND**

**PARTIES**

1. Plaintiff CRG Financial, LLC ("CRG") is a Delaware limited liability company with a principal place of business in Cresskill, New Jersey.

2. Plaintiff Claims Recovery Group, LLC ("Claims Recovery", and, with CRG, the "CRG Parties" or the "Plaintiffs") is a Delaware limited liability company with a principal place of business in Cresskill, New Jersey.

3. Defendant Two Diamond Capital Corp. ("Two Diamond") is a Massachusetts corporation with a principal place of business at 100 Ledgewood Place, Suite 102, Rockland, Massachusetts.

4. Defendant Medea Inc. (Medea") is a Delaware corporation with a place of business at 5653 Stoneridge Drive, Suite 119, Pleasanton, California.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1332(a) because there is complete diversity of citizenship among the parties and because the amount in controversy exceeds $75,000, excluding costs.

6. Defendants are each subject to personal jurisdiction in this district because they entered into the contracts at issue with parties operating in Massachusetts and caused injury to Plaintiffs in Massachusetts through conduct, actions, and communications that took place in substantial part in Massachusetts.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTS

8. On March 21, 2017, Two Diamond's Michael Kot ("Kot") e-mailed CRG's Joseph Brosnan ("Brosnan") regarding an opportunity to participate in a loan facility. The loan facility would finance the purchase by Bevriqo, Inc. ("Bevriqo"), a California company, of approximately 19,387 cases of vodka from Medea, an importer from Holland. The e-mail referred to multiple purchase orders that Medea would soon receive. Kot wrote to Brosnan in part: "This financing is going to happen fast. We can do some of it but we sure can't do all of this." *See* e-mail of Michael Kot dated March 21, 2017, a true and correct copy of which is attached hereto at <u>Exhibit 1</u>.

9. Kot and Brosnan continued to correspond. In March 2017, Kot told Brosnan that Two Diamond intended to fund a $1.8 million facility, that it had approval to fund $500,000 of that amount with its own money.

10. On March 22, 2017, Kot wrote to Brosnan with reference to the loan facility, "We're in." *See* e-mail of Michael Kot dated March 22, 2017, a true and correct copy of which is attached hereto at <u>Exhibit 2</u>.

11. On March 23, 2017, Kot forwarded to Brosnan an e-mail from Bevriqo's Chief Executive Officer, Richard Cabael ("Cabael"), stating that 168 cases of Medea vodka has been shipped pursuant to a purchase order received by Medea, that 224 cases of vodka and 168 cases of vodka had all been shipped against two other purchase orders, and that unspecified numbers of cases had been shipped against two further orders. *See* e-mail dated March 23, 2017 from Michael Kot, a true and correct copy of which is attached hereto at <u>Exhibit 3</u>.

12. On or about April 6, 2017, Two Diamond forwarded to the CRG Parties purported purchase orders for Medea vodka, which Two Diamond had received from Medea. The purchase orders included the following:

- three orders from Duggan Distillers Product Corp., all dated February 16, 2017, in the amounts of $37,968, $50,624, and $37,968, respectively;

- two orders from Allstar Brands and Distribution RD, dated March 15, 2017 and March 23, 2017, in the amounts of $448,627.60 and $224,313.60 respectively;

- an order from Young's Market Company dated March 6, 2017, in the amount of $25,312; and

- an order from Breakthru Beverage Nevada LLC dated March 23, 2017, in the amount of $12,656.56

*See* true and correct copies of purchase orders attached hereto as <u>Exhibit 4</u>.

13. Under the heading "ALL STAR AGREEMENT," Two Diamond also represented in writing to Plaintiffs that "All Star Global has agreed to a 3 year contract to purchase a minimum of 17,500 cases per year and are projecting 21,000 cases for 2017." Two Diamond stated the total amount of this contract, assuming the minimum order of 17,500 cases per year, as

3

"$10.5 million." *See* Bevriqo Brands Medea Vodka Opportunity, a true and correct copy of is attached hereto as <u>Exhibit 5</u>, at p.2.

14. All of the foregoing representations concerning purchase orders originated from Medea. Medea knew them to be false. Two Diamond knew or should have known them to be false.

15. Also on April 6, 2017, Two Diamond forwarded to the CRG Parties a "Medea Market Analysis Letter" (the "Market Analysis") from The Branford Group ("Branford"). Two Diamond had hired Branford to make the Market Analysis. The Market Analysis stated among other things that in a distressed closeout sale of approximately 21,447 cases of Medea vodka (that is, 262,166 bottles at 12 bottle per case), an expected aggregate recovery would range from $1.9 million to $2.2 million. The vodka that Bevriqo would purchase was part of the approximately 21,447 cases of vodka referenced in the Market Analysis. *See* a true and correct copy of Market Analysis attached hereto as <u>Exhibit 6</u>.

16. On or about April 7, 2017, Two Diamond sent to Plaintiffs a document entitled "Two Diamond Capital DBA Two Diamond Business Credit Participation Opportunity" (the "Participation Memo").

17. The Participation Memo described that Bevriqo was to buy the assets of Medea. It also stated:

> Two Diamond is being asked to provide a $3MM line of credit to provide for the initial purchase and to fund ongoing working capital needs of the company. Due to portfolio concentration limits of $500M per loan customer by our lender, we have to syndicate the other $2.5MM. Our initial advance is $2MM with no more than $1.5MM against inventory with a cost value of $2.9MM.

*See* Participation Memo, a true and correct copy of which is attached hereto as <u>Exhibit 7</u>, at p. 1. This statement communicated in substance that: (a) Two Diamond would invest

4

752193

$500,000 in the loan to Bevriqo; and (b) that Two Diamond's funds would be part of the "initial advance" to Bevriqo.  These statements were knowingly false when made.

18. The Participation Memo also stated:

> The company [*i.e.* Medea] has secured Purchase Orders for ultimate sales to Krogers (3900 store chain) and Costco (2900 store chain).  Both of these stores have done extensive test marketing of this product in California which resulted in the roll-out of this brand across the entire chain.  Sales are imminent and may commence prior to the close of our deal.  We hope to close this deal by early next week….quite possibly Monday April 10 2017.

*Id*. at p. 1.  When Two Diamond made the quoted statement, it knew or should have known that the "roll-out" of Medea vodka had not "resulted…across the entire chain[s]" of Costco and Kroger stores.

19. The Participation Memo also stated:

> Two Diamond business Credit is providing a $3MM ABL line of credit.  Initial funding will be $2MM and we are looking for additional participants to provide the needed $1MM of addition credit.  Participants will be paid 2% per month on their participation interest or 24% per annum.  We anticipate this transaction to have a life of approximately 1 years time … Monthly interest is directly deposited in an account of your choosing once the appropriate paperwork is completed.

*Id*. at p. 3.  When Two Diamond made the quoted statement, it knew that it was not providing a $3,000,000 line of credit.

20. On or about April 11, 2017, Two Diamond and Bevriqo entered into a Loan Agreement and Security Agreement (the "Loan Agreement"), and an Inventory Loan Addendum.  On the same date, Bevriqo made a Demand Secured Promissory Note in the amount of $2,000,000 to the order of Two Diamond (the "Bevriqo Note"), and Cabael signed a personal guaranty of the Bevriqo Note ("Cabael Guaranty").  *See* true and correct copies of each at Exhibits 8-10.

5

21. On or about April 17, 2017, and in reliance on Medea's and Two Diamond's representations, CRG and Claims Recovery each entered into Participation Agreements with Two Diamond, true and correct copies of which are attached hereto as <u>Exhibits 11 and 12</u>.

22. Each Participation Agreement states in part that:

> Participant agrees that Lender will retain in Lender's name, but on behalf of Participant to the extent of the Participation interest in the Loan, all of the obligations of borrower arising out of the Loan Documents….

*See* <u>Exs. 11 and 12</u> at p. 3, sec. 4(a):

> Lender agrees that it will use the same prudence and judgment in the servicing of Borrower' [sic] account and in carrying out the terms of the Loan Documents as it would with regard to one of its own loans in which there was no participant.

*Id*. at p. 4, sec. 4(f).

> At any time during which Lender is administering the Loan Documents with Borrower, however, Lender will obtain the prior written consent of Participant prior to: (i) agreeing to any waiver or amendment which would reduce the principal due on the Loan; or (ii) releasing all or substantially all of the Collateral under the Loan Documents, or releasing any guarantees;

*Id*.

23. The CRG Parties understood that the loan facility included an Inventory Loan and a Receivables Loan, and that their $1.3 million would fund a portion of the $1.5 million Inventory Loan. They also believed, however, based on Two Diamond's previous misrepresentations, that Two Diamond was funding the balance of the Inventory Loan and, based on the false representations of both Medea and Two Diamond, that accounts receivable to collateralize the Receivables Loan were imminent, and that Two Diamond would imminently fund the Receivables Loan. The CRG Parties' understanding that Two Diamond would be a co-investor was material to their decision to participate. Without this understanding, they would not have participated. Their understanding is confirmed by the amounts of their participation as a

percentage of the total loan balance, as reflected in the language of the Participation Agreements. CRG's Participation Agreement stated that its participation would be "an amount equal to forty per cent (40%) of the total Loan Advances as are outstanding from time to time (the "Participation Percentage"), not to exceed eight hundred thousand dollars ($800,000.00). *See* Exhibit 11 at p. 1. Claims Recovery's Participation Agreement contained the same language except using the figures of 25% and $500,000 instead of 40% and $800,000. The combined amounts of the Inventory Loan and Receivables Loan were $2,000,000. $800,000 is 40% of $2,000,000 and $500,000 is 25% of $2,000,000. *See* Exhibit 12, at p. 1. The CRG Parties understood Two Diamond to be supplying the remaining 35% of the funds and were shocked, after default, to learn that Two Diamond had put no money into the facility.

24. Pursuant to its Participation Agreement, and in reliance on the information provided by Two Diamond and Medea, CRG caused $800,000 of its funds to be delivered to Two Diamond.

25. Pursuant to its Participation Agreement, and in reliance on the information provided by Two Diamond and Medea, Claims Recovery caused $500,000 of its funds to be delivered to Two Diamond.

26. The CRG Parties reasonably believed that purchase and sales transactions reflected in the Medea purchase orders would begin to generate revenue before or shortly after the CRG Parties supplied their $1.3 million.

27. Two Diamond caused the CRG Parties' $1.3 million to be wired to Medea to fund Bevriqo's purchase of Medea's inventory of vodka.

28. Medea's intent in knowingly making false representations regarding purchase orders, and Two Diamond's intent in repeating the same false representations, were to induce the

7

participation of prospective loan participants including Plaintiffs.  At minimum the CRG Parties are persons, or are within a class of persons, whom Medea had reason to expect would act and rely the on Medea's misrepresentations.

29.     The CRG Parties did so act and rely to their detriment by entering into the Participation Agreements.  The CRG Parties would not have entered into the Participation Agreements and would not have supplied $1.3 million toward Bevriqo's purchase had they known the falsity of Medea's and Two Diamond's representations.

30.     On or about May 1, 2017, Two Diamond's George Gochis ("Gochis") e-mailed the CRG Parties that they would receive $12,638.92 as their combined first month's payments of interest on their participations.  The CRG Parties received these payments.  Two Diamond, however, had received no interest payment from Bevriqo and failed to so inform the CRG Parties.

31.     On or about June 1, 2017, Two Diamond sent the CRG Parties, combined, $17,222.26 as their second month's interest on their participations.  Again, this money did not originate from Bevriqo.  Two Diamond did not tell the CRG Parties that Bevriqo had not paid.

32.     The source of funds for the payments described in the preceding two paragraphs was credit that Two Diamond extended to Bevriqo as an advance on the Receivables Loan described in the Loan Agreement and the Participation Agreements.  *See* Business Credit Direct Corp. Interest Statement, attached to e-mail to Joseph Brosnan dated August 4, 2017; *see also* e-mail to Joseph Brosnan dated July 28, 2017, true and correct copies of which are attached hereto at <u>Exhibit 13</u>.  Two Diamond's Michael Kot told Brosnan that Two Diamond advanced money to Bevriqo on the Receivables Loan in order to earn a return on that loan.  At the time of Two Diamond's advance, Bevriqo had no accounts receivable for sales of Medea vodka.  *See id*. at

8

August 4, 2017 e-mail (stating that "…inventory is the only collateral being managed at the moment."). Accordingly Two Diamond's advance on the Receivables Loan was unsecured.

33. Bevriqo made no sales of Medea Vodka in April, May, June, or July of 2017, and made no payments on the Loan Documents.

34. In July 2017, Two Diamond declared a default under the Loan Documents.

35. On August 16, 2017, Two Diamond filed a civil action against Bevriqo, Cabael and others in the Massachusetts Superior Court, Plymouth County, captioned *Two Diamond Capital Corp. v. Bevriqo, Inc., et al.*, Civil Action No. 17-83-CV-00865 (the "Plymouth County Action"). A true and correct copy of the Complaint (without exhibits) in the Plymouth County Action is attached hereto as Exhibit 14.

36. Two Diamond retained Branford to liquidate the Collateral. Branford was able to sell one container (1,120 cases) of the collateral at a price of approximately $90 per case. The sale was to Horizon Beverage, a wholesaler for the State of New Hampshire Liquor and Wine Outlets, run by the New Hampshire State Liquor Commission (the "New Hampshire Sale").

37. The loan participants were entitled to the proceeds of the New Hampshire Sale. They received none. From the proceeds of the New Hampshire Sale, Two Diamond paid, among other things, $21,757.83 to itself. Two Diamond purports to be owed a balance of $26,067.75 that the proceeds of the New Hampshire Sale were insufficient to satisfy.

38. To date, none of the Collateral has been sold in connection with the purported purchase orders described in paragraphs 11-13 above.

39. On May 31, 2018, Two Diamond executed a Cooperation and Settlement Agreement with Bevriqo, Cabael, and Spectrum Spirits, Inc., another defendant in the Plymouth

County Action (the "Settlement Agreement").  *See* Cooperation and Settlement Agreement, a true and correct copy of which is attached hereto as <u>Exhibit 15</u>.

      40.      Section 4(f) of the Participation Agreements required Two Diamond to:

> …obtain the prior written consent of Participant prior to:  (i) agreeing to any waiver or amendment which would reduce the principal due on the Loan; or (ii) releasing all or substantially all of the Collateral under the Loan Documents, or releasing any guarantees;

*See* Participation Agreements, <u>Exs. 11 and 12</u> at p. 4, sec. 4(f).

      41.      The Settlement Agreement recited that the so-called "Bevriqo parties" jointly and severally owed a "balance due… [of] approximately $2,250,000," but that Two Diamond "has agreed to accept the lesser amount of $2,100,000…."  *See* Settlement Agreement at p. 1.

      42.      The Settlement Agreement also states in part that:

> Lender agrees to release Cabael from his Guaranty and his personal liability under the Execution if and when the Net Proceeds from the sale(s) of the Gateway Inventory reach a total of $1,700,000.  For purposes of this Agreement Net Proceeds shall mean the total of all sums received from the sale of the Gateway Inventory less all costs incurred by the Lender in connection with the Lawsuit, the preparation, negotiation and enforcement of this Agreement, and costs of sale, including without limitation Lender's legal fees, commissions and storage and other costs due to Gateway (collectively, "Expenses").

*Id*. at p. 3 and:

> Net Proceeds in excess of $1,700,000 shall be paid 50% to Lender and 50% to the Bevriqo parties (or to such party(ies) as the Bevriqo parties may designate) until Lender receives a grand total equal to the Judgment Amount of $2,100,000 (i.e., an additional $400,000), at which time Lender will cancel the Note; the Bevriqo parties (or such party(ies) as the Bevriqo parties may designate) shall receive all remaining Net Proceeds.  Any shortfall in the payment of the Judgment Amount from the proceeds of the Gateway Inventory shall remain due and owing by the Bevriqo parties, except to the extent that Cabael may have been released as a result of having satisfied certain provisions hereof.

*Id*. at p. 4 and:

752193

> However, Lender's counsel shall hold the Execution in escrow pending all parties' full compliance with the terms and conditions of this Agreement.

*Id.* at p. 3 and:

> Provided the Bevriqo parties comply with all terms and condition of this Agreement, and notwithstanding that the Judgment Amount carries with it a statutory interest rate of 12% per annum, Lender agrees to waive all interest on the Judgment Amount for a period of twelve (12) calendar months after the date of the Agreement for Judgment.

*Id.* and:

> After payment of all Expenses, Lender shall receive 90% of the first $1,700,000 of Net Proceeds, with the remaining 10% to be paid into an escrow account maintained by Lender's counsel from which Lender agrees to pay additional sales and marketing expenses that are approved by Lender in its sole but reasonable judgment.

*Id.* at p. 4.

43. On June 27, 2018, Two Diamond, Bevriqo, Cabael and Spectrum Spirits filed an Agreement for Judgment pursuant to the Settlement Agreement. A true and correct copy of the Agreement for Judgment is attached hereto as Exhibit 16.

44. Also on June 27, 2018, Two Diamond requested an execution on its judgment in the Plymouth County Action.

45. Two Diamond has not foreclosed on its security interest or levied against assets in order to satisfy execution.

46. In December 2018, Kot informed Brosnan that a company called Grocery Outlet had submitted a purchase order for approximately 1,000 cases of Medea vodka. Kot represented that Grocery Outlet was a sales lead of Cabael's. The CRG Parties understand and believe that: (a) vodka has been shipped to Grocery Outlet on its purchase order; and (b) that Medea has written to Grocery Outlet demanding that it not sell the vodka. They have repeatedly asked Two

Diamond for a copy of the purchase order and for the amount that Cabael or his agent are to be paid as a sales commission.  Two Diamond had ignored their requests for information.

### COUNT 1 (Breach of Contract v. Two Diamond)

47. The CRG Parties incorporate the allegations of paragraphs 1 through 46.

48. By its actions alleged herein, Two Diamond has breached its contractual duties to plaintiffs under the Participation Agreements, including their contractually-adopted fiduciary duties.

49. The CRG Parties have suffered and will continue to suffer harm and monetary damages, in an amount to be determined at trial, as a result.

### COUNT 2 (Breach of Implied Covenant of Good Faith and Fair Dealing vs. Two Diamond)

50. The CRG Parties incorporate the allegations of paragraphs 1 through 49.

51. Two Diamond's conduct alleged herein constitutes a breach of the covenant of good faith and fair dealing implied in the Participation Agreements.

52. The CRG Parties have suffered harm and monetary damages, in an amount to be determined at trial, as a result of Two Diamond's breach.

### COUNT 3 (Fraud v. Medea)

53. The CRG Parties incorporate the allegations of paragraphs 1 through 52.

54. In order to induce the CRG Parties to fund Bevriqo's purchase, Medea knowingly and materially misrepresented the existence of bona fide purchase orders.

55. Medea knew that its representations were false in material respects at the time such representations were made.

56. Plaintiffs are persons or are among a class of persons whom Medea knew or should have known would rely on its fraudulent misrepresentations.

12

752193

57. The CRG Parties reasonably relied on Medea's fraudulent misrepresentations in entering into its Participation Agreements with Two Diamond.

58. The CRG Parties have suffered damages in the amount of no less than $1,233,374.90 as a result of Medea's fraud. This sum represents their $1.3 million investment minus $40,625.10 of interest payments minus $26,000 of the facility fees charged to Bevriqo, which were paid to the CRG Parties as of the closing.

### Count 4 (Misrepresentation v. Two Diamond)

59. The CRG Parties incorporate the allegations of paragraphs 1 through 58.

60. In order to induce the CRG Parties to fund Bevriqo's purchase, Medea knowingly and materially misrepresented the existence of bona fide purchase orders.

61. Two Diamond transmitted the purchase orders to Plaintiffs and knew or should have known that the purchase orders were false.

62. The CRG Parties reasonably relied on the fraudulent purchase orders in entering into its Participation Agreements with Two Diamond.

63. The CRG Parties have suffered harm and damages as a result.

64. The CRG Parties seek rescission of the Participation Agreements and repayment of no less than $1,233,374.90. This sum represents their $1.3 million investment minus funds received to date.

### COUNT 5 (Chapter 93A vs. Two Diamond)

65. The CRG Parties incorporate the allegations of paragraphs 1 through 64.

66. Two Diamond's conduct respecting the CRG Parties and the Participation Agreements constitutes unfair and deceptive trade practices as prohibited under Massachusetts law.

67. Two Diamond's unfair and deceptive trade practices occurred primarily and substantially in Massachusetts.

68. The CRG Parties have suffered and will continue to suffer harm and monetary damages, in an amount to be determined at trial, as a result of Two Diamond's unfair and deceptive practices.

## PRAYERS FOR RELIEF

**WHEREFORE**, for all of the above stated reasons, Plaintiffs respectfully request this Honorable Court:

1. Enter judgment for CRG and Claims Recovery on Counts 1 through 5 of this Verified Complaint and Jury Demand, including damages in the amount to be determined at trial;

2. Rescind the Participation Agreements and order Two Diamond to repay the CRG Parties no less than $1,233,374.90;

3. Award Plaintiffs pre- and post-judgment statutory interest and costs;

4. Award Plaintiffs attorneys' fees and multiple damages;

5. Order temporary and preliminary relief as requested by the Plaintiffs' accompanying motion for same; and

6. Award such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury on all claims and issues so triable.

Respectfully Submitted,

CRG FINANCIAL, LLC and CLAIMS RECOVERY GROUP, LLC
By their counsel,

/s/ *Daniel J. Dwyer*
Andrew G. Lizotte (BBO #559609)
Daniel J. Dwyer (BBO #567026)
MURPHY & KING, P.C.
One Beacon Street, 21st Floor
Boston, Massachusetts 02108-3107
Tel: (617) 423-0400
Fax: (617) 423-0498

Date: January 28, 2019

## VERIFICATION

I, Joseph Brosnan, have read he foregoing allegations of this Verified Complaint. I state under the penalties of perjury that the facts alleged are true as based on my personal knowledge, and where not on my personal knowledge, to the best of my information and belief.

Joseph Brosnan

Dated: January 28, 2019

752193